<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MICHAEL KELLY,<br><br>                   Plaintiff,<br><br>        v.<br><br>DUPREES MJA, LLC, ESTATE OF MICHAEL ARNONE, By Isabella Ahern, Executrix, ISABELLA AHERN, TONY TESTA, PHIL GRANITO; TOMMY PETILLO, JIMMY SPINELLI; DUPREES ENTERTAINMENT, LLC, and PYRAMID MUSIC, LLC,<br><br>                 Defendants. | Civil Action No. 2:08-cv-6046 (SDW) (MCA)<br><br><br>**OPINION**<br><br><br><br>March 23,2012 |

**WIGENTON**, District Judge.

Before this Court is Defendant Duprees MJA, LLC; Estate of Michael Arnone, by Isabella Ahern, Executrix, Isabella Ahern, Tony Testa, Phil Granito, Tommy Petillo, Jimmy Spinelli, Duprees Entertainment, LLC, and Pyramid Music, LLC's, (collectively "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 1338(b), 1367 (b) 1391(b) and (c) and 15 U.S.C. § 1121. Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c). This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, this Court **GRANTS** Defendants' motion.

**I.    BACKGROUND**

This action involves claims pertaining to trademark law.  Plaintiff Michael Kelly ("Kelly"), a former member of a singing group, is seeking to cancel the registration of a trademark in the group's name that was acquired by Michael Arnone ("Arnone").  Kelly seeks cancellation of the trademark on the bases that (1) the trademark was fraudulently procured and (2) the trademark has been and continues to be infringed by licensed third parties.  The issues before this Court are whether Arnone fraudulently procured the trademark registration and assuming the trademark is invalid, whether the group currently using the trademark is infringing on it.

## II.    FACTS

Plaintiff contends that in 1960, five men, Michael Arnone, John Salvato ("Salvato"), Joseph Santollo ("Santollo"), Thomas Bialoglow ("Bialoglow"), and Michael Kelly formed a singing group called "The Parisiens" in Jersey City, New Jersey. (Pl.'s Counter Statement of Undisputed Material Facts "PCSOF" ¶¶ 1-2.)  Defendants, however, argue that Kelly was not an original member of the group, but instead joined the Parisiens to replace lead singer, John Canzano ("Canzano").  (*See* Defs.' Statement of Undisputed Facts ("DSOF") ¶ 2.)  Sometime between 1961 and 1962, Kelly left the group in hopes of a successful solo career.  (DSOF ¶ 3.)  To that end, after leaving the group, Kelly signed an individual recording contract with Columbia Records.  (*Id.* at ¶ 4.)  After leaving the group in 1961 or 1962, Kelly was replaced by Canzano.  (PCSOF ¶ 4.)  Subsequent to Canzano's return, Defendants contend that Coed Records suggested to the group that it change its name to "The Duprees".  (DSOF ¶ 62.)  Kelly argues that he was with the group when it began to refer to itself as the Duprees and that he was the lead singer. (*Id.* at ¶ 2.)  Defendants contend that the name change occurred when Canzano was lead singer, during Kelly's hiatus in the early '60s.  (DSOF ¶ 6.) Kelly contends that shortly before his departure, the vocals he recorded with the group were presented to George Paxton, head of Coed

Records.  (*Id.* at ¶¶5-6.) After Kelly left the group, Coed signed the Duprees for a record deal.

(*Id.*) Since Kelly was no longer with the group at the time of the signing, he was not a party to

the group's contract with Coed Records. (DSOF ¶ 8.)  During Kelly's hiatus, in 1963, Arnone,

Salvato, Santollo, and Canzano, filed a Business Certificate for Partners ("Partnership

Certificate") with the County Clerk and Clerk of the Supreme Court of New York County, New

York. (DSOF ¶ 17.) Kelly was not a signatory to the Partnership Certificate. (*Id.*) This certificate

was never amended to include Kelly. (*Id.* at ¶ 31.)  Also during Kelly's hiatus, the Duprees

released two of their first records which garnered the group immediate success. (DSOF ¶¶ 9-10.)

Kelly did not sing on either of the group's first two records, which included the group's top hits

and established the group's "Doo-wop" sound. (*Id.* at ¶ 14.)

       Canzano left the Duprees in or around 1965, (DSOF ¶ 21), and Kelly rejoined the group

that same year. (DSOF ¶ 27.) When he returned, the group signed many management and

recording agreements including an agreement with Jerry Ross, a record promoter and producer.

(PCSOF ¶¶ 9-12, 17.)[1]  In these agreements, Kelly contends that the group referred to themselves

collectively as "The Duprees." (*Id.* at ¶ 13.) Kelly argues that proof of this is seen in the May 29,

1974, agreement where the group hired Frank Cirillo as a new member. (Matthew S. Hawkins

Declaration ("Hawkins Decl."), Ex. V.)

       In 1978, Kelly stopped performing with the group due to irreconcilable differences

between Kelly and Arnone. (Hawkins Decl. Ex. G at 111, 144-45.) Kelly alleges that he never

released his rights to the Duprees' partnership after he stopped performing.  Kelly also contends

that he stayed active with the group by speaking with John Salvato periodically about the

---

[1] Among the contracts Kelly refers to are: (1) a May 1, 1965 Artist Recording Agreement with Kama-Sutra
Productions, Inc., which was assigned to Columbia Records; (2) a 1965 exclusive agency contract with Associated
Booking Corp.; (3) a June 16, 1965 publishing agreement with Tender Tunes Music Co., Inc.; and (4) a 1969
agreement between Arnone, Santollo, Kelly and Salvato whereby they created Kass Music Corp., a New Jersey
corporation.

Duprees' record sales and promotion. (PCSOF ¶ 29.)  Since leaving the group, Kelly has not received any payments, including royalty payments from any record label. (*Id*. at ¶ 144.) In September, 1978, Tommy Petillo took over as the lead singer of the group. (DSOF ¶ 55.)  In 1979, the group stopped recording and took a break from performing due in part to changes in the music industry, namely the decline in popularity of doo-wop music and the rise of disco music.  (*See* DSOF ¶ 56, 60.)  Despite the group's hiatus, Arnone kept the group name active.[2] Arnone actively performed with or managed the group throughout the 1960's, 70's, and 80's. (DSOF ¶ 109.)  Arnone also organized a new collection of singers to perform with him as the Duprees.[3]  (Hawkins Decl. Ex. N, ¶ 6.)

In September 1979, Arnone filed an application with the Patent and Trademark Office ("PTO") to register the trademark "DUPREES" (the "Mark").  (DSOF ¶ 64.) When Arnone filed with the PTO, Kelly was not performing as a member of the Duprees or making any use of the Duprees name. (*Id*. at ¶ 67.)  Kelly contends that Arnone applied for registration of the Mark despite knowing that Santollo and Salvato were receiving bookings as the Duprees and performing as original members of the group.  (PCSOF ¶¶ 34-35.) Defendants acknowledge that sometime after 1979, Salvato, along with others, began performing as "John Salvato's Duprees". (DSOF ¶ 89.)  However, Defendants contend that Salvato severed his relationship as a performing member of the Duprees in 1978 and became a booking agent. (DSOF ¶ 57.)  On July 7, 1981, the PTO issued the registration (the "Registration") for DUPREES to Arnone for "entertainment services, namely, musical performances rendered by a group."  (*Id*. at ¶ 66.)[4]

Sometime in the 1980s, Arnone hired Tony Testa ("Testa") to perform as a new member of the group and later to assist in the group's musical direction, while working under Arnone's

---

[2] Salvato became a full-time booking agent.  (DSOF ¶ 57.)
[3] The new singers include, among others, Tony Testa, Phil Granito, Tommy Petillo, and Jimmy Spinelli.
[4] In 2001, Arnone renewed the Registration for an additional ten year term.  (*See* DSOF ¶ 116.)

supervision.  (*See id.* at ¶¶ 33, 35.)  In or about 1993, due to personal reasons, Arnone stopped

performing regularly with the Duprees.  (*See* Hawkins Decl. EE, ¶ 19.)  In the late 1990's

Arnone also hired Ron O' Brien ("O' Brien") as a booking agent for the group.  (*See id.* at ¶ 38.)

O' Brien also performed his duties under Arnone's supervision.  (*See id.* at ¶39.)  After Arnone's

death in October 2005, his estate (the "Estate") became the sole owner of the Mark.  (DSOF ¶

122.)  When Arnone passed away, his Estate approached O' Brien and Testa about the future of

the Duprees, including the continued use of the Mark under the Estate's supervision as well as

payment of license or royalty fees.  (*See id.* at ¶ 44.)  Both Testa and O' Brien contested the

Estate's ownership of the Mark, and as a result of an impasse in understanding, the Estate

commenced an action against Testa and O' Brien for trademark infringement and other relief.

(DSOF ¶125.)  The action was settled, and as part of the settlement, Testa and the rest of the

group ("Testa Group") continued to perform as the Duprees pursuant to a formal license between

Duprees MJA, as licensor, and Duprees Entertainment, LLC, as licensee.  (DSOF ¶ 127.)[5]

    On December 5, 2008, Kelly and Salvato filed an initial complaint in the instant action.

On March 16, 2009, Defendants filed a motion to dismiss the original complaint. On August 3,

2009, this Court dismissed all of Salvato's claims and some of Kelly's claims. This Court also

granted Kelly's motion for leave to amend the Complaint. Kelly filed an amended complaint on

August 14, 2009, alleging the following claims: (i) Testa Group's alleged violation of the New

Jersey Deceptive Practices in Musical Performances Law ("DPMPL"), cancellation of the

trademark registration pursuant to 15 U.S.C. § 1064, and a declaratory judgment action based on

Defendants' unauthorized continued use and exploitation of the mark DUPREES and/or THE

---

[5] In March 2009, the Estate assigned its rights in the Mark and registration to Duprees MJA and the assignment was recorded with the PTO.  (*See* DSOF ¶ 128.)

DUPREES in connection with a musical act. (Pl.'s Am. Compl.) Defendants then filed the instant motion on August 8, 2011.

III.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). The court may not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue as to a material fact. *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in "a light most favorable" to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991). The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

## IV.    DISCUSSION

Kelly argues that pursuant to 15 U.S. C. § 1119, the Mark should be cancelled because Arnone did not disclose the interests of Kelly, Santollo and Salvato when he applied for the Mark and, hence, obtained it by fraud. (Pl.'s Am. Compl. ¶¶ 36, 39.) Kelly also seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 for trademark infringement, unfair competition and fraudulent procurement of a trademark registration. (*Id*. at ¶ 41.) Lastly, Kelly claims that the Testa Group's past and continued exploitation of the Mark is unauthorized and therefore prohibited by the New Jersey DPMPL. (*Id*. at ¶¶ 28-34.) Defendants argue that Kelly lacks standing to challenge the trademark registration because Kelly was not using the Mark when Arnone applied for registration, Kelly did not have interest in the trademark because he was not an original member of the Duprees nor was he ever assigned such an interest after rejoining the group, and no contract gives him such a right. (Defs.' Br. 22-31.) Additionally, Defendants argue that even if this Court were to find that Kelly has standing his claims should fail for three reasons.  First, Defendants contend that they own superior rights in the Mark because: (1) Arnone exclusively controlled the nature and quality of the Mark, (2) Arnone used the Mark in commerce prior to Kelly joining the group, (3) Arnone and his successors have continuously used the Mark since 1962, and (4) Kelly has abandoned the Mark. (*Id*. at 31-42.) Second, Defendants argue that Kelly cannot prove fraud on the procurement of the trademark registration with "clear and convincing evidence." (*Id*. at 42-48.) Third, Defendants argue that Kelly's DPMPL claim fails as a matter of law because Kelly was not an "original member" of the Duprees and he abandoned both the Mark and his affiliation with the group when he quit in 1978. (*Id*. at 48-50.)

This Court will first discuss the issue of standing.

## A. Standing

"[A] party seeking cancellation [of a registered trademark] must prove two elements: (1) that it has standing; and (2) that there are valid grounds for canceling the registration." *See Int'l Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1091 (Fed. Cir. 1984).  To have the requisite standing, a party must demonstrate "a real and rational basis for his belief that he would be damaged by the registration sought to be cancelled, stemming from an actual commercial or pecuniary interest in his own mark." *Id.* (citing *Star–Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 349 (9th Cir. 1984)); *see also Horizon Healthcare Servs. v. Allied Nat'l, Inc.*, No. 03-4098, 2006 WL 344277 at \*6 (D.N.J. Feb. 14, 2006) (noting that standing requires "that the party seeking cancellation believe that it is likely to be damaged by the registration.").  Stated differently, "petitioner must prove that [he] is not a mere intermeddler, but rather that [he] has a real interest in the outcome of this proceeding and thus a reasonable basis for [his] belief that [he] is damaged by the existence of respondent's registration." *Littel Concepts, LLC v. Striker Records, Inc.*, 2010 WL 5574282, at \*2 (T.T.A.B. Dec. 10, 2010).

Kelly advances four bases on which he has standing.  First, Kelly argues that he has an actual commercial or pecuniary interest in the Mark because he was an original member of the Duprees and the likeness of his image is still used on the group's retail products.  (Pl.'s Br. 15.)  Second, Kelly argues that he has the requisite interest because of contracts he signed when he was a member of the Duprees, namely the 1974 agreement with Mr. Cirillo, which refers to the then existing members as the Duprees.  (*Id.*, *id.* at 18.)  Third, Kelly argues that even though he was not using the Mark at the time Arnone applied to register it, he had an interest in the sale of the group's music.  (*Id.* at 19.)  Last, Kelly argues that he exercised control over the group name through Jerry Ross, who Kelly alleges continues to promote the group.  (*Id.*)  None of Kelly's

9

arguments permit him to satisfy his burden regarding standing.  Kelly's argument that his status as an original member confers standing misses the point of demonstrating an actual commercial or pecuniary interest in the Mark.  The same is true for his argument regarding the likeness of his image.  Regarding Kelly's reliance on contracts he signed during his tenure with the group, Kelly has failed to clarify how any of those contracts, which were signed in the 60s and 70s currently constitute a commercial interest in the Mark.  Last, Kelly's reliance on Jerry Ross's promotion of the Duprees also fails because Kelly has not shown how Jerry Ross's actions translate into a pecuniary interest in the Mark for Kelly.  It should be noted that, at Kelly's deposition, he could not and did not identify a "real interest" when asked to identify his pecuniary interest in the cancellation of the Mark. (Hawkins Reply Dec., Ex. B, pp. 157-60.)  It should also be noted that Kelly testified that if Arnone had informed him of his intent to file the application to register the Mark, Kelly would have allowed Arnone to do so without any objection. (DSOF ¶ 69.)  Kelly's assertions are insufficient to establish that he has a real interest in the cancellation of the trademark.  Therefore it follows that he does not have a real and rational basis for his belief that he was damaged or is being damaged by Arnone's registration of the Mark.   Therefore, Kelly has not established standing.  However, even if Kelly did have standing, he would not prevail on his claims.

**B.  Superior Rights in the Trademark**

Defendants argue that even if Kelly had standing, Defendants are entitled to judgment as a matter of law because Defendants have superior rights in the Mark.  To support their argument Defendants contend that: (1) Arnone exclusively controlled the nature and quality of services performed under the Mark, (2) Arnone used the Mark prior to Kelly's use of the Mark since, according to Defendants, Kelly joined the Duprees as a replacement lead singer, (3) Arnone

10

continuously used the Mark since 1962, and (4) Kelly abandoned the Mark.  (Defs.' Br. 31-38.)

Kelly argues that Arnone does not have superior rights in the Mark because: (1) Kelly can

establish prior use in the Mark as an equal member, (2) he is an original member, (3) he has

continuously used the mark, and (4) he did not abandon the Mark.[6]  (Pl.'s Br. 21-24.)

> i.    *Exclusive Use and Control of The Nature and Quality of Services*

"Common-law trademark rights "are appropriated only through actual prior use in

commerce.'"  *Crystal Entm't & Filmworks v. Jurado*, 643 F.3d 1313,1321 (11th Cir.

2011)(citing *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188,1193-94 (11th Cir.

2001)).  There is a two-part test to determine whether a party has proved prior use; courts look at

(1) "[e]vidence showing first adoption", and (2) "use in a way sufficiently public to identify or

distinguish the [mark] . . . in an appropriate segment of the public mind as those of the adopter of

the mark . . . ."  *Planetary Motion, Inc.*, 261 F.3d at 1195.

Defendants argue that Arnone used the name "the Duprees" in commerce before Kelly

because the group signed their first record deal in 1962 with Coed records, during Kelly's first

departure from the group.  (*See* Defs.' Br. 32.)  Furthermore, Defendants argue that Kelly was

not a member of the group in 1962 and 1963 when the Duprees released a number of successful

recordings.  (*Id.*)  Kelly, however, argues that he can establish prior use by virtue of the

numerous recording contracts to which he was a party, particularly the 1974 agreement with

Cirillo.  (Pl.'s Br. 22.)  Despite Kelly's best efforts, he cannot show use of the Mark prior to

1962.  Therefore, Kelly has not illustrated that he adopted use of the Mark before Arnone or that

---

[6] Kelly argues that he has superior rights to Arnone by virtue of common law trademark
rights.  (Compl. 37.)  Kelly also argues that he has superior rights due to contracts that were executed during his
tenure in the group.  (*Id.*)  Kelly further contends that he has superior rights in the mark pursuant to statutory law
(*Id.*)  Kelly fails to clarify either in the complaint or in his opposition brief which statute(s) or which contracts he is
relying on for his arguments.  Since Kelly has failed to clarify his argument regarding contractual and statutory
rights, this Court will only address Kelly's argument regarding common law trademark rights.

he used the Mark "in a way sufficiently public" to establish ownership in the Mark. Consequently, Kelly cannot successfully rebut Defendants' argument regarding exclusive use and control of the nature and quality of services.

      ii.    *Continuous Use*

      Defendants next argue that Arnone, and thereby Defendants, has continuously used the Mark since 1962, putting him/them in the position to claim ownership of the Mark.  (Defs.' Br. 33.)  Courts that have confronted the issue of a former music group member who continues to claim rights to the name of the group have determined that members of a group do not retain rights to the group's name upon leaving the group.  *See Robi*, 173 F.3d at  739 (citing *HEC Enters., Ltd. v. Deep Purple, Inc.,* 213 U.S.P.Q. 991 (C.D. Cal. 1980) (former members of a group were prohibited from performing under the group's name when members of the original group along with new members, continued to use the name); *Kingsmen v. K-Tel Int'l, Ltd.*, 557 F.Supp. 178 (S.D.N.Y. 1983) (holding, *inter alia*, that the former lead singer of The Kingsmen, who was with the group when it recorded arguably its biggest hit, did not have the right to use the name after his departure)).  "It has [also] been held . . . that there is no inalienable interest at stake that would attach to [a] departing [group] member." *Id.* (citing *Giammarese v. Delfino*, 197 U.S.P.Q. 162, 163 (N.D. Ill. 1977)).  Instead, it has been held that "a person who remains continuously involved with the group and is in the position to control the quality of its services retains the right to use of the mark, even when that person is a manager rather than a performer." *Id.* (citing *Rick v. Buchansky*, 609 F.Supp. 1522 (S.D.N.Y. 1985).  Here, the facts show that Arnone continued to use the "Duprees" name for decades after the group "stopped recording and took a break from performing" in 1979.  (DSOF ¶ 60.)  Contrarily, the facts show that Kelly has

had no active or direct involvement with the group since he left the group in 1978.  Therefore,

Kelly cannot successfully counter Defendants' argument regarding continuous use.

iii.     *Abandonment*

To successfully argue abandonment of a trademark, a party must prove non-use and actual intent to abandon.  *See Marshak v. Treadwell*, 240 F.3d 184, 198 (3d Cir. 2001) (citing *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 31 (1900)).  "Intent not to resume may be inferred from circumstances.  Nonuse for [three] consecutive years shall be prima facie evidence of abandonment."  15 U.S.C. § 1127 (2006).  Defendants argue that they have superior rights in the Mark because Kelly abandoned the Mark when he left the group.  (Defs.' Br. 38.)  Kelly, relying on *Marshak*, contends that he has not abandoned his rights.  In *Marshak*, Faye Treadwell ("Treadwell"), the widow and the successor-in-interest to The Drifters' manager and owner George Treadwell, sought to maintain her common law rights to "The Drifters" mark.  *See Marshak*, 240 F.3d at 189-190.  After 1970, the Drifters made few live appearances as several group members had departed and the group's popularity declined.  *See id.* at 188.  Larry Marshak was an editor with the *Rock* magazine, who around 1969, was charged with the responsibility of reuniting the Drifters, among other groups, to do revival concerts.  *See id.*[7]  In 1972, Marshak signed an exclusive contract with two of the group members to continue performing after the revival concerts.  *See id.*  Treadwell sought to prevent Marshak from infringing on her rights, but failed. *See id.*  Treadwell, later released a book in which she claimed to be the sole owner of the Drifters mark.  *See id.* at 189.  Marshak then brought an action asserting that Treadwell infringed on his alleged mark and threatened to continue infringing through book sales.[8]  The case went to trial before a jury, and the jury found, *inter alia*, that Faye Treadwell and her corporation had abandoned the "Drifters" mark; however, the district court vacated the jury's finding.  *See id.*

---

[7] The project was a joint venture between *Rock* Magazine and CBS radio. *See id.*
[8] Marshak also named The Drifters, Inc., Treadwell's Drifters, and a booking company as defendants.

The district court reasoned that the continuous stream of royalty revenues collected by Treadwell prevented a finding of abandonment. *See id.*

The Third Circuit, in upholding the district court's decision, completely relied on the reasoning of the lower court. The district court had found that, as a matter of law, "there was no abandonment because 'the original Drifters recordings had been played on the radio and sold in record stores, without interruption, for [at that point] the past 40 years.'" *Id.* at 199 (citing *Marshak v. Treadwell*, 58 F.Supp.2d 551, 575 (D.N.J. 1999)). The district court stated that "[a] successful musical group does not abandon its mark unless there is proof that the owner ceased to commercially exploit the mark's secondary meaning in the music industry", which Marshak did not prove. *Id.* The district court essentially adopted the reasoning of *Kingsmen v. K-Tel Int'l, Ltd.*, where the court held that despite the group disbanding, "the fact that [the] individuals continue to receive royalties for Kingsmen recordings flies in the face of any suggestion of intent to abandon use of the name Kingsmen." *Kingsmen*, 557 F.Supp. at 183; *see Marshak*, 58 F.Supp.2d at 575.

Kelly argues that similar to *Marshak*, he has not abandoned the Mark because of continued internet and radio play of the group's music, and because of licensing agreements with Jerry Ross. Kelly's argument is misplaced as it presupposes that merely receiving airplay and royalties precludes a finding of abandonment. The basis for the decision in *Marshak* and *Kingsmen* was the fact that in both cases, the party defending the abandonment allegation showed that management and/or members of the group continued to promote their music in addition to receiving royalties. *See Drowning Pool LLC v. Drowning Pool*, 2007 WL 2070917 * 8, (T.T.A.B. July 11, 2007), and *Zamacona v. Ayvar*, No. 07-2767, 2009 WL 279073 *2, (C.D. Cal. Feb. 3, 2009) (explaining the reasoning behind *Marshak* and *Kingsmen*). Here, Kelly

cannot dispute his non-use of the Mark after he left the group.  Further, Kelly testified during a deposition that he did nothing to promote the group after his departure in 1978.  (*See* Hawkins Decl. Ex. G at 140.)  Kelly argues that Jerry Ross has continued to promote the group's music on behalf of the original members of the group; however, Jerry Ross testified that his obligations to the group and vice versa ended in 1977.  (*See* Hawkins Decl. Ex. H at 56.)  Therefore, even if Jerry Rose has continued to promote the group's music after 1977, (*See id.* at 124), it is unlikely that he did so for the benefit of the group or for Kelly's benefit.  Therefore, Kelly cannot successfully dispute his non-use of the Mark.  Also, Kelly's intent to abandon the Mark can be inferred from his non-use of the Mark for more than three years.  Accordingly, Kelly cannot successfully defend Defendants' argument regarding abandonment.

### B.  Fraudulent Procurement of a Trademark

Kelly contends that Arnone committed fraud on the PTO when he applied for registration of the Mark because: (1) other group members were using the Mark; (2) other members had equal rights to the Mark; (3) confusion would result from the Registration; and (4) Arnone sought sole registration of the Mark despite knowing of the rights of the other group members.  (Pl.'s Br. 26.)  To prove fraud on the PTO, a party seeking cancellation of a mark must show: "[1] a false representation regarding a material fact, [2] the registrant's knowledge or belief that the representation is false, [3] the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and [4] damages proximately resulting from the reliance."  *Robi*, 918 F.2d at 1444.  The burden to prove fraud is "heavy," *see id.* at 1439, as it must be proven by clear and convincing evidence, *see In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009).  "There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *Id.*  "[A]bsent the requisite intent to mislead the PTO, even

a material misrepresentation would not qualify as fraud under the Lanham Act warranting cancellation." *Id.* "[D]eception must be willful to constitute fraud," *id.*, and "[m]ere negligence is not sufficient to infer fraud or dishonesty," *Id.* at 1244. As a result, "[s]ubjective intent to deceive, however difficult it may be to prove, is an indispensable element in the analysis." *Id.* at 1245. Intent to deceive may be inferred from circumstantial evidence; however, "'such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement.' " *Id.* (quoting *Star Scientific, Inc.*, 537 F.3d at 1366). Thus, "[w]hen drawing an inference of intent, 'the involved conduct, viewed in light of all the evidence . . . must indicate sufficient culpability to require a finding of intent to deceive.'" *Id.* (ellipsis in original) (citing *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc)).

In his brief, Kelly focuses on the argument that Arnone knew, at the time he filed for registration of the Mark, that he was not the only person using the Mark or who had rights to the Mark. Kelly, however, fails to specifically address the issue of Arnone having a subjective intent to deceive the PTO. Kelly's argument is fatally flawed because case law is clear that proof of subjective intent to deceive is indispensable to a claim for fraudulent procurement of a trademark. *See In re Bose Corp.*, 580 F.3d at 1245. Therefore, even if Kelly had standing, he would not prevail on his attempt to cancel the Mark.

## C. DPMPL Claim

Kelly argues that the Testa Group's past and continued exploitation of the Mark is unauthorized because the Mark is invalid. Since Kelly has not been able to prove that the Mark is invalid, Kelly's argument would fail.

**CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is granted.


s/Susan D. Wigenton, U.S.D.J.


Orig:   Clerk
Cc:     Madeline Cox Arleo, U.S.M.J.
        Parties